788 So.2d 1064 (2001)
Charles Edward DAVIS, Appellant,
v.
STATE of Florida, Appellee.
No. 2D00-755.
District Court of Appeal of Florida, Second District.
May 23, 2001.
*1065 James Marion Moorman, Public Defender, and Timothy J. Ferreri, Assistant Public Defender, Bartow, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Wendy Buffington, Assistant Attorney General, Tampa, for appellee.
PATTERSON, Chief Judge.
Charles Davis appeals from the denial of his motion to suppress and his judgment and sentence for possession of cocaine and no valid driver's license. Because the police conducted a driver's license checkpoint that violated the Fourth Amendment, we reverse the denial of the motion to suppress and the resulting judgment and sentence.
The State charged Davis with possession of cocaine and no valid driver's license as a result of the Tampa Police Department's stop of Davis at a driver's license checkpoint on June 30, 1999. Davis filed a motion to suppress and challenged the stop on Fourth Amendment grounds. After the trial court denied the motion and found it to be dispositive, Davis entered a guilty plea to the charges and reserved his right to appeal. The trial court withheld adjudication and placed Davis on eighteen months' probation on the possession of cocaine charge. On the charge of no valid driver's license, the court adjudicated Davis guilty and sentenced him to time served.
Relying on City of Indianapolis v. Edmond, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000), Davis contends on appeal that this court must reverse the trial court's denial of his motion to suppress because the primary purpose of the checkpoint was to interdict drugs. We agree, but we note that the trial court did not have the benefit of the Edmond decision at the time of the suppression hearing.
Generally, a search or seizure violates the Fourth Amendment as unreasonable when law enforcement lacks an "individualized suspicion of wrongdoing." Id. at 37, 121 S.Ct. at 451. A program involving suspicionless searches or seizures will be upheld only in limited circumstances to fulfill special law enforcement needs. Id. The Supreme Court in Edmond held that an Indianapolis checkpoint program violated the Fourth Amendment because the primary purpose of the program was to interdict narcotics, a purpose "ultimately indistinguishable from the general interest in crime control." Id. at 48, 121 S.Ct. at 458. The Edmond Court acknowledged that it had suggested in Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), that driver's license and registration checkpoints for the purpose of roadway safety would be constitutional. The Court explained that it must "examine the available evidence to determine the primary purpose of the checkpoint program." Edmond, 531 U.S. at 46, 121 S.Ct. at 457. The Supreme Court stressed that "the purpose inquiry in this context is to be conducted only at the programmatic level and is not an invitation to probe the minds of individual officers acting at the scene." Id.
Based on Edmond, if the checkpoint program here had a primary purpose of interdicting drugs or other general criminal wrongdoing, then the checkpoint was unconstitutional. The State argues that the checkpoint program is constitutional based on Officer Steven Lee's testimony. Officer Lee of the Tampa Police Department testified at the suppression hearing that he was involved in implementing a program called "Operation Safe Streets" on June 30, 1999. One component of the operation was "a driver's license checkpoint on 26th Avenue East of *1066 22nd Street of every fifth vehicle." Officer Lee testified that every fifth vehicle was directed to the parking lot of the Lee Davis Center. After determining whether the driver had a license and registration, the driver was sent on his way. Officer Lee testified that the stop was designed to last less than five minutes.
When asked if the purpose of the checkpoint was to target illegal drug activity, Officer Lee responded, "No, it was to target people without licenses. If you get drugs that's fine too, but basically it's a driver's license checkpoint." Officer Lee, however, did not testify that targeting people without licenses was for the purpose of improving roadway safety.
In fact, the written plan for the "Operation Safe Streets" program, which Officer Lee authored and the State introduced into evidence, describes the program as follows:
Operation SAFE STREETS is a coordinated effort of various components of the Tampa Police Department. The operation is designed to take back the neighborhoods with repeated complaints of narcotic activity from dealers and buyers, and prostitution. Operation SAFE STREETS will bring to bear the combined efforts of the Tampa Police Department's QUAD Squad, Street Anti-Crime Unit, Fire-house Squad, X-Ray Squad, Traffic Squad and Uniform Patrol. The combined forces will target illegal drug activity within the various affected neighborhoods within the City of Tampa.
The written program also lists its major goals.[1] The goals deal with illegal drugs and alcohol, prostitution, and "restor[ing] a sense of safety to the neighborhood by lessening the hazardous element associated with criminal activity." The goals make no mention of roadway safety. Rather, the goals make it clear that the purpose of Operation Safe Streets is to reduce drug and prostitution activity in the targeted areas. This is nothing more than a checkpoint program with a primary purpose "to detect evidence of ordinary criminal wrongdoing" which Edmond prohibits. Edmond, 531 U.S. at 38, 121 S.Ct. at 452.
Therefore, we reverse the trial court's denial of Davis's motion to suppress and his resulting judgment and sentence for possession of cocaine and no valid driver's license and remand with directions that Davis be discharged.
Reversed and remanded with directions.
GREEN and SILBERMAN, JJ., concur.
NOTES
[1] The written program states the following goals:

OPERATION SAFE STREETS
The four (4)[sic] major goals of this operation are as follows:
(1) Disrupt drug sales and purchases in the affected areas
(2) Conduct pending buys from known dealers culminating in a roundup at the end of the operation
(3) Reduce the usage of alcoholic beverages by minors and adults in affected areas
(4) Curtails [sic] the amount of prostitution and prostitution related crime in the outer areas of this neighborhood
(5) Restore a sense of safety to the neighborhood by lessening the hazardous element associated with criminal activity
(6) Improve public perception of the department's ability to reduce narcotics and prostitution activity in the neighborhoods